# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,                           Case No. 23-cr-00257 (JWB/ECW)

     Plaintiff,

v.                                                  **REPORT AND RECOMMENDATION**

Jean Loic Ouedraogo,

     Defendant.

   This matter is before the Court on Defendant Jean Loic Ouedraogo's Motion to Dismiss the Indictment for Violation of Defendant's Sixth Amendment Speedy Trial Right (Dkt. 331). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. The Court held a hearing on the Motion on October 10, 2025. (Dkt. 347.) Harry Jacobs, Assistant U.S. Attorney, appeared on behalf of the Government, and Amy Connors appeared on behalf of Ouedraogo, who was present at the hearing. (*Id.*) The Court took the Motion under advisement at the conclusion of the hearing. For the reasons stated below, the Court recommends denial of the Motion.

## I.  BACKGROUND

   On August 17, 2023, Ouedraogo was charged by Indictment with conspiracy to commit mail fraud, bank fraud, and aggravated identity theft. (Dkt. 1.) Seven other co-defendants were charged under the same Indictment. (*Id.*) Because the timing of the prosecution with respect to Ouedraogo's codefendants is relevant to the parties'

arguments, the Court discusses this procedural background before describing the facts related to Ouedraogo.

## A.    The Codefendants

Ouedraogo's codefendants were all arrested within one month of the Indictment. On August 18, 2023, Wendinboude Ouedraogo,[1] Romaric Sompougdou, and Wenlasombo Ilboudo were arrested.  (Dkts. 13-15.)  On August 29, 2023, Ronnie Raines was arrested.  (Dkt. 61.)  On September 1, 2023, Dushaun Kennedy was arrested, and on September 7, 2023, Aristide Zong-Naba was arrested.  (Dkts. 44-45.)  On September 13, 2023, Habib Foro was arrested.  (Dkt. 60.)  The Indictment remained sealed as to Ouedraogo until July 31, 2024.  (Dkt. 199.)

Only one of the codefendants, Sompougdou, was detained following his initial appearance in the District of Minnesota.  (Dkt. 52.)  All other codefendants were released.  (Dkts. 16, 19, 24, 26, 28, 30, 38, 40, 71, 74, 81.)

Trial was originally scheduled to begin on February 21, 2024.  (Dkt. 120.)

All but one of the codefendants pled guilty to Count 1 of the Indictment.  On January 29, 2024, Kennedy pled guilty to Count 1 of the Indictment.  (Dkt. 130.)  On February 12, 2024, Sompougdou pled guilty to Count 1 of the Indictment.  (Dkt. 138.)  On February 13, 2024, Wendinboude pled guilty to Count 1 of the Indictment.  (Dkt. 140.)  On February 27, 2024, Zong-Naba pled guilty to Count 1 of the Indictment.  (Dkt. 145.)  On May 28, 2024, Ilboudo pled guilty to Count 1 of the Indictment.  (Dkt. 168.)

---

[1]     For clarity, this Report and Recommendation refers to Wendinboude Ouedraogo as "Wendinboude," and Jean Loic Ouedraogo as "Ouedraogo."

2

On July 31, 2024, Raines pled guilty to Count 1 of the Indictment.  (Dkt. 198.)  Except for Wendinboude, all of those codefendants have been sentenced.  (Dkts. 224, 240, 265, 269, 291.)

Two of Ouedraogo's codefendants, Foro and Wendinboude, have fled the country. Wendinboude pleaded guilty, but on May 6, 2024, his lawyer informed the government that Wendinboude had left the United States without permission and his whereabouts were unknown.  (Dkt. 140; Dkt. 151 at 2.)[2]  Foro's spouse reported that Foro called her from an international telephone number and informed her that he was in Africa, prompting U.S. Probation to file a violation report on December 5, 2024, and request a warrant for Foro's arrest.  (*See* Dkt. 119 at 2-3.)  Foro's counsel sought a stay of these proceedings in view of Foro's absence, which the Court granted.  (Dkts. 117, 126.)

## B.    Ouedraogo's Arrest

Ouedraogo was not arrested until May 8, 2025.  (Dkt. 310.)  The government described its efforts to locate and arrest Ouedraogo as follows.  During the investigation, and before Ouedraogo was indicted, the government obtained information that he was living in a suburb of Washington D.C., but that he had moved out of that apartment. (Dkt. 345 at 2.)  In August 2023, the day before the Indictment issued, law enforcement obtained a ping warrant for Ouedraogo's phone.  (*Id.*)  The ping data showed that Ouedraogo was in the Washington, D.C. area, but did not provide specific enough information to locate him, and the warrant eventually expired.  (*Id.*)  Law enforcement

---

[2]    Unless otherwise indicated, page numbers refer to the CM/ECF pagination.

obtained a second ping warrant in October 2023.  (*Id.*)  The data showed that Ouedraogo was still in Washington, D.C., but "law enforcement were unable to successfully use the ping data to locate Ouedraogo due to the density of the city."  (*Id.*)

On March 8, 2024, Ouedraogo filed a Form I-485 Permanent Resident Application.  (Dkts. 331 at 2, 332-1 at 2-3).  This form gave an address in York, South Carolina for Ouedraogo.  (*Id.*)  However, the case agent responsible for locating Ouedraogo did not receive notice of this application until September 2024, even though Ouedraogo's arrest warrant had been entered in the NCIC database.  (Dkt. 345 at 2-3.)  After learning of Ouedraogo's application, the case agent requested assistance from local postal inspectors in the Carolinas.  (*Id.* at 3.)  The record does not reflect what, if anything, resulted from that request.

In October 2024, law enforcement obtained a search warrant for Ouedraogo's last known phone number.  (*Id.*)  The results of this search warrant indicated that the phone was no longer active.  (*Id.*)  Beginning in November 2024, law enforcement attempted to identify a new phone number for Ouedraogo, including by reviewing bank records.  (*Id.*)

Also, in November, 2024, law enforcement learned that Ouedraogo's significant other had changed her address from York, South Carolina to Wake Forest, North Carolina.  (*Id.*)  Law enforcement determined her address in December 2024.  (*Id.*)

On January 2, 2025, the U.S. Citizenship and Immigration Services issued a notice for Ouedraogo to appear at an initial interview for his permanent residence application.  (Dkt. 332-1 at 1.)  The notice indicated that the interview would take place in South

Carolina on February 11, 2025.  (*Id.* at 2.)  Ouedraogo appeared at the interview.  (Dkt. 331 at 2.)

By March 2025, law enforcement had identified a new phone number for Ouedraogo and obtained a search warrant for location data for that phone, which showed that Ouedraogo was in Maryland.  (Dkt. 345 at 3.)  The U.S. Marshal Service arrested Ouedraogo in Maryland on May 8, 2025.  (*Id.*)

An attorney was appointed to represent Ouedraogo on June 6, 2025.  (Dkt. 317.)  The Government moved for Ouedraogo's detention.  (Dkt 331.)  A detention hearing was held on June 9, 2025, and the motion for detention was granted.  (Dkts. 319, 321.)

On August 26, 2025, Ouedraogo moved to dismiss the Indictment on the basis that the 20-month delay between Ouedraogo's indictment and his arrest violated his Sixth Amendment right to a speedy trial.  (Dkt. 331 at 1.)

## II.    ANALYSIS

The Constitution provides that in all criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  The Supreme Court has articulated four factors that courts should assess in determining whether a defendant has been deprived of their constitutional right to a speedy trial: "[the l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  None of these four factors are "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  *Id.* at 533.

A.    **The Length of Delay**

The first *Barker* factor is the length of the delay. *Id.* at 530. "The Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." *United States v. Erenas-Luna*, 560 F.3d 772, 776 (8th Cir. 2009) (citation modified). Here the length of delay at issue is the 20 months that elapsed between Ouedraogo's indictment and his arrest.

The length of delay factor requires a "double enquiry." First, to trigger a speedy trial analysis, a defendant must allege that a delay "crossed the threshold" from an ordinary delay to a delay that is presumptively prejudicial. *Doggett*, 505 U.S. at 651-52. Once a speedy trial analysis is triggered, courts must consider the length of delay as "one factor among several" and evaluate "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* at 652; *see also United States v. McGhee*, 532 F.3d 733, 739 (8th Cir. 2008). The importance of this factor "increases with the length of the delay." *Doggett*, 505 U.S. at 656.

As to the threshold inquiry, courts have generally found a delay that "approaches one year" to be presumptively prejudicial. *Doggett*, 505 U.S. at 652 n.1 (citing 2 W. LaFave & J. Israel, Criminal Procedure § 18.2, p. 405 (1984); Joseph, Speedy Trial Rights in Application, 48 Ford. L. Rev. 611, 623, n.71 (1980)); *see also United States v. Lewis,* 146 F.4th 621, 629 (8th Cir. 2025) ("Generally, a delay over a year has been found to be presumptively prejudicial."). Ouedraogo argues, and the Government does not contest, that the first inquiry is satisfied such that a speedy trial analysis is necessary.

(*See* Dkt. 345 at 4.)  The Court agrees that a delay of 20 months meets the threshold necessary to trigger a speedy trial analysis.

As to the secondary inquiry—weighing the length of delay as a factor in a speedy trial analysis—the Court considers this factor in context with the other *Barker* factors. *See infra* Part II.D.3.

## B.    The Reason for the Delay

The second *Barker* factor is the reason for the delay.  *Barker*, 407 U.S. at 531. The Supreme Court has explained that:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Id.*  Here, the parties dispute the reason for the delay.  Ouedraogo does not assert that the Government acted in bad faith but argues that the reason for the delay is the Government's negligence.  (Dkt. 331 at 4.)

A finding of government negligence in the second *Barker* factor would also impact the analysis of the fourth *Barker* factor because, as discussed in greater detail below, defendants need not demonstrate actual prejudice in some cases where the reason for delay is government negligence.  *See infra* Part II.D; *Doggett*, 505 U.S. at 657.  On the other hand, "[a] showing of actual prejudice is required if the government exercised reasonable diligence in pursuing the defendant."  *Erenas-Luna,* 560 F.3d at 778-79.

As evidence of the Government's negligence, Ouedraogo emphasizes that, during the 20-month delay before his arrest, he had multiple contacts with the federal government related to his I-485 application for permanent resident status.  (*Id.* at 5.) Ouedraogo argues that these actions "would have quickly facilitated his arrest, had the Government been acting with due diligence."  (*Id.*)  Ouedraogo cites several cases in which courts found the "reason for delay" factor to weigh in favor of defendants when the government failed to arrest a defendant in a timely manner following immigration proceedings.  (Dkt. 331 at 4-5 (citing *United States v. Akinsola,* 57 F. Supp. 2d 455, 458 (E.D. Mich. 1999); *United States v. Alabi*, No. CR MJM-20-72, 2025 WL 1615448, at *9 (D. Md. June 6, 2025)).)

The Government, on the other hand, argues that it diligently pursued Ouedraogo's arrest and "is not to blame for the delay at issue."  (Dkt. 345 at 4.)  The Government asserted that the relevant case agent did not receive notice of Ouedraogo's I-485 Permanent Resident Application until six months after it was submitted.  (*Id.* at 2-3.) Ouedraogo's counsel clarified at the hearing that she was not suggesting that the Government should have arrested Ouedraogo at his immigration interview.  Rather, Ouedraogo argues that the fact that he was not arrested until eight months after the relevant case agent learned of his immigration proceedings is evidence of the Government's negligence.

The Court finds that the delay that followed the Government learning of Ouedraogo's immigration proceedings does not constitute negligence.  The cases that Ouedraogo cites on this point do not hold that any delay following an immigration

proceeding constitutes negligence. Rather, they considered a defendant's immigration proceedings within the larger context of the Government's efforts to locate a defendant. In *United States v. Akinsola,* the court concluded that a pre-arrest delay was attributable to the Government where it spent only one day searching for the defendant, after which it officially "closed its efforts to find Defendant by memo." 57 F. Supp. 2d 455, 457 (E.D. Mich. 1999). During this pre-arrest delay, the defendant "filed tax returns, applications to the INS, telephone and gas services, and college applications" and "also applied for resident alien cards, driver's licenses and Social Security Cards." *Id.* at 458 (footnote omitted). "The government made no attempts to check any of these governmental agencies." *Id.* In *United States v. Alabi*, the court concluded that a pre-arrest delay was attributable to the Government where it "took no active steps to determine [the defendant's] whereabouts or to effect his arrest," instead assuming that the defendant was abroad. 786 F. Supp. 3d 905, 919 (D. Md. 2025). During the pre-arrest delay in *Alabi*, the Government took "no action" in response to multiple notifications that the defendant had applied for immigration relief and listed a U.S. address. *Id.* at 919-20.

The Government's actions in the present case are distinguishable from *Akinsola* and *Alabi*. Here, the Government requested assistance from local postal inspectors in the Carolinas after learning that Ouedraogo listed a South Carolina address on his immigration paperwork. (Dkt. 341 at 2-3). Further, the Government continued pursuing other avenues to locate Ouedraogo, including obtaining a search warrant for his last known phone number, determining an address for Ouedraogo's significant other, and obtaining another search warrant for his phone location data. (*Id.*) Given these facts, the

Court cannot conclude that the delay that followed Ouedraogo's immigration proceedings constitutes negligence.

In assessing the reason for the delay, the Court also considers to what extent, if any, Ouedraogo is responsible for the delay in his arrest, as a delay caused by a defendant weighs against that defendant. *See Vermont v. Brillon*, 556 U.S. 81, 90 (2009); *see also Barker*, 407 U.S. at 529 ("[I]f delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine"). Here, the Government has asserted that Ouedraogo's conduct in changing addresses and phone numbers, rather than any negligence on the part of the government caused the delay in his arrest. (*Id.* at 5.)

At the hearing, the Government argued that it was reasonable to infer that Ouedraogo changed his location and phone number because he was aware of the Indictment against him. The Government emphasized that between January and March 2024—after codefendant Wendinboude had pled guilty but before he fled the country— Ouedraogo spoke on the phone with Wendinboude 95 times, which was essentially every day. (Dkt. 341 at 5-6.) The Government argues that "[i]t would be curious if the two co-defendants never discussed the indictment" during any of those calls. (*Id.*) The Government concedes that the Indictment was still sealed as to Ouedraogo at that point but argues that Ouedraogo would have known that he might be a defendant as well. Counsel for Ouedraogo did not argue that Wendinboude and Ouedraogo never discussed the Indictment. Rather, Ouedraogo's counsel argued that the allegations in the Indictment as to Ouedraogo's involvement in the conspiracy were so minor that he would not have thought that he might be prosecuted, even if he learned of the Indictment against

10

Wendinboude.  Further, Ouedraogo points out that his actions in applying for a green card and appearing at his immigration interview contradict the idea that he was intentionally evading arrest.  (Dkt. 331 at 5.)

If Ouedraogo had been aware of the Indictment against him and deliberately evaded arrest, the reason for the delay would weigh heavily against him.  *See Doggett*, 505 U.S. at 653.  However, the Court cannot find based on the current record that Ouedraogo's actions in changing his address and phone number were intentional attempts to evade arrest.  Rather, the Court considers his conduct as relevant to whether the Government was reasonably diligent in attempting to locate him.

Considering all of the relevant circumstances, the Court concludes that the Government acted with reasonable diligence.  While it may have been possible for the government to pursue Ouedraogo's arrest more aggressively, its efforts to locate Ouedraogo significantly exceeded those in cases where the Government was found to be negligent.  In *Doggett*, for instance, the Supreme Court explained that the government had been negligent because "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes."  *Doggett*, 505 U.S. at 652-53.  In *Erenas-Luna*, the Eighth Circuit concluded that the reason for the delay was the Government's negligence where "the government readily admit[ed] that it 'dropped the ball,' let [defendant's] case 'slip through the cracks,' made no efforts to locate and arrest [defendant] over a three-year period, and missed multiple opportunities to apprehend [defendant] in a timely manner."  560 F.3d at 777.

In contrast, the Eighth Circuit has concluded in other cases that the Government was not negligent even where its efforts were imperfect. In *U.S. v. Rodriguez-Valencia*, the Eighth Circuit affirmed the district court's conclusion that the cause of the delay was not government negligence, even where law enforcement failed to timely submit an "INTERPOL Red Notice" upon learning that the defendant had been apprehended in Nicaragua, which could have led to his arrest at an earlier date. 753 F.3d 801, 806-07 (8th Cir. 2014). Despite not taking this step, law enforcement had pursued numerous other leads in its search for the defendant. *Id.* at 807. The Eighth Circuit described those circumstances as a "close case," but ultimately agreed with the district court that the Government was not negligent. *Id.*

This case is much closer to the facts of *Rodriguez-Valencia* than it is to *Doggett* or *Erenas-Luna*. Around the time of the Indictment, the Government tried twice to locate Ouedraogo by obtaining a warrant for the location data from Ouedraogo's phone, but the data it obtained was not specific enough to find Ouedraogo. (Dkt. 341 at 2). While the Government did not report taking any active steps to locate Ouedraogo for a significant period of the 20-month delay (from November 2023 to August 2024), the Government did not formally abandon its efforts to locate Ouedraogo as it did in *Akinsola*. *See* 57 F. Supp. 2d at 457. After learning of Ouedraogo's I-485 application, the Government continued pursuing his arrest, including by requesting assistance from another agency, obtaining a search warrant for Ouedraogo's last known phone number, reviewing bank records to identify a new phone number, and obtaining a search warrant for that phone's location data. (Dkt. 341 at 2-3). The Court concludes that these efforts were reasonably

diligent, and finds that the second *Barker* factor does not weigh against either party.[3]  *See Rodriguez-Valencia*, 753 F.3d at 806 (concluding that the reason for delay factor did not weigh against either party); *United States v. Richards*, 707 F.2d 995, 997 (8th Cir. 1983) (concluding that even though the reason for the delay was that the government was unable to locate the defendant, this factor should not be weighed against the government because the government was not negligent).

**C.      The Defendant's Assertion of his Right**

The third *Barker* factor is the defendant's assertion of his speedy trial right. *Barker*, 407 U.S. at 531-32.  However, the Eighth Circuit has held that when the delay in dispute predates a defendant's arrest, this factor "has little bearing."  *Erenas-Luna*, 560 F.3d at 778.  The fact that a defendant did not assert their right until after their arrest will not be held against them, as long as they were unaware of the charges against them prior to arrest.  *Doggett*, 505 U.S. at 653-54.  In these circumstances, the third *Barker* factor weighs neither for nor against either party.  *Erenas-Luna*, 560 F.3d at 778.

Because the Court is unable to conclude on the record before it that Ouedraogo was aware of the Indictment against him prior to his arrest, the circumstances of this case are such that the third *Barker* factor has little bearing and does not weigh against either party.

---

[3]      In the alternative, even if the Court found that the Government's efforts in this case did not rise to the level of reasonable diligence, it would still recommend denial of the Motion because a 20-month delay is not long enough to warrant relief absent a showing of particularized prejudice.  *See infra* Part II.D.3.

**D.    Prejudice to the Defendant**

The fourth *Barker* factor is prejudice to the defendant.  *Barker*, 407 U.S. at 530.

Several forms of prejudice can result from a delay, "including oppressive pretrial

incarceration, anxiety and concern of the accused, and the possibility that the accused's

defense will be impaired by dimming memories and loss of exculpatory evidence."

*Doggett*, 505 U.S. at 654 (citation modified).  Here, the only form of prejudice that

Ouedraogo asserts is the impairment of his defense.  (Dkt. 331 at 7-9.)

The impairment of the accused's defense is the most serious form of prejudice

"because the inability of a defendant adequately to prepare his case skews the fairness of

the entire system."  *Doggett*, 505 U.S. at 654.  For example, an accused's defense may be

impaired if "witnesses die or disappear during a delay" or if "defense witnesses are

unable to recall accurately events of the distant past."  *Barker*, 407 U.S. at 532.  The

Supreme Court has recognized that "time's erosion of exculpatory evidence and

testimony" can be difficult to show.  *Doggett*, 505 U.S. at 655.  Thus, a defendant does

not always need to specify how their defense was impaired in order to prevail on a speedy

trial claim.  *Doggett*, 505 U.S. at 654 ("[C]onsideration of prejudice is not limited to the

specifically demonstrable, and . . . affirmative proof of particularized prejudice is not

essential to every speedy trial claim.").

Whether particularized prejudice is required depends on both the reason for the

delay and the length of the delay.  "A showing of actual prejudice is required if the

government exercised reasonable diligence in pursuing the defendant."  *Erenas-Luna*,

560 F.3d at 778-79; *Doggett*, 505 U.S. at 656 (noting that generally, if the government

14

acted with reasonable diligence and the defendant could not show prejudice to his defense, a speedy trial claim would fail "however great the delay"). If the reason for delay is the government's negligence, however, whether actual prejudice is required depends on the length of the delay. *Doggett*, 505 U.S. at 657 ("[T]o warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice."). In cases of "extraordinary" delay, courts have found that the "prejudice" factor of the *Barker* analysis weighs in favor of the defendant even when there is no showing of particularized prejudice. *See Doggett*, 505 U.S. at 657; *Erenas-Luna*, 560 F.3d at 779-80.

Ouedraogo argues that the unavailability of the two codefendants who have fled the country, whom Ouedraogo might have called as witnesses, constitutes particularized prejudice. Ouedraogo also argues that he has been prejudiced because, if not for the delay, he would not have been detained pending trial, and that his detention has inhibited his ability to build his defense. (Dkt. 331 at 9.) In the alternative, Ouedraogo argues that no showing of particularized prejudice is required.

### 1.    Unavailability of Fugitive Codefendants as Witnesses

Ouedraogo argues that he is prejudiced because his defense has been deprived of "important and favorable witnesses." (Dkt. 331 at 7.) Ouedraogo's brief did not identify these witnesses, but at oral argument counsel explained that these missing witnesses are codefendants Wendinboude and Foro, who fled the country during the 20-month delay. The Government responded that it is not credible Ouedraogo would call Wendinboude and Foro because, as alleged coconspirators, they would be government witnesses but for

their right not to incriminate themselves.  Further, the government argued that these individuals would have fled and been unavailable for Ouedraogo's trial even if there had been no delay.

Beginning with the timing of the fugitive codefendants' flight, the Court notes that trial for the codefendants who were promptly arrested was scheduled to begin on February 21, 2024.  (*See* Dkt. 120.)   It is true that Foro, who had fled by November 23, 2023, would not have been available as a witness regardless of the delay in Ouedraogo's arrest.  (*See* Dkt. 98 at 1.)  However, Wendinboude, who did not flee until after March 29, 2024, could have been available for a February 21, 2024 trial date.  (*See* Dkt. 151 at 2.)  The Court cannot rule out the possibility that Wendinboude could have testified at Ouedraogo's trial, if not for the delay in Ouedraogo's arrest.

The Court next considers the government's argument that it would not be in Ouedraogo's interest to call Wendinboude as a witness.  To establish prejudice, Ouedraogo must show that the missing witnesses could have supplied material evidence for the defense.  *See United States v. Richards*, 707 F.2d 995, 998 (8th Cir. 1983).  The Eighth Circuit has declined to find prejudice where there was no indication that a missing codefendant's testimony would have helped a defense.  *E.g., United States v. Titlbach*, 339 F.3d 692, 699-700 (8th Cir. 2003); *Richards*, 707 F.2d at 998; *see also Thomas v. United States,* 501 F.2d 1169, 1172 (8th Cir. 1974) ("A missing witness whose testimony cannot help a defendant constitutes a flimsy basis on which to claim prejudice.").

Here, Ouedraogo has not articulated what exculpatory evidence Wendinboude could have supplied.  The Court notes that on February 13, 2024, before the scheduled

trial date, Wendinboude pled guilty to Count 1 of the Indictment. (Dkt. 140.) As part of his plea, Wendinboude admitted the allegations in the Indictment. (*Id.*) Given these facts, the Court does not find any indication that Wendinboude's testimony would have helped Ouedraogo's defense and therefore does not find particularized prejudice as a result of Wendiboude's unavailability. *See United States v. Summage*, 575 F.3d 864, 876 (8th Cir. 2009) (finding that the defendant did not "meet his burden" to establish he suffered any prejudice for a Sixth Amendment speedy trial claim when he only "listed the names of people who he vaguely claimed would have been able to offer some evidence to impeach [a witness] or to provide corroborative evidence to substantiate the defense theory") (citation modified).

### 2.    Pretrial Detention

Ouedraogo also argues that the pre-arrest delay has prejudiced his defense because, had he been arrested before Foro's and Wendiboude's flight, he would not have been detained pending trial. (Dkt. 331 at 9.) Ouedraogo points to the fact that most of his codefendants were not detained pending trial, and that the government raised Foro's and Wendiboude's flight at Ouedraogo's detention hearing.

The Government contests the assumption that Ouedraogo would not have been detained if he had been arrested prior to his codefendants' flight. The Government points to the fact that one codefendant—Sompougdou, who was arrested the day after the indictment—was detained following his initial appearance in the District of Minnesota. (Dkt. 52.) The Government also represented at the hearing that, although his codefendants' flight was a factor in its choice to seek Ouedraogo's detention, it would

have done so regardless of their flight, given Ouedraogo's significant ties to nonextradition countries and the allegation that the offense involved fraudulent travel documents.

The Government's position is supported by Magistrate Judge John F. Docherty's Order for Detention, which states that "[t]he United States's argument was based primarily on Mr. Ouedraogo's contacts with Burkina Faso, a country with which the United States does not currently have an extradition treaty, as well as the nature of the instant offense, which involved allegations that Mr. Ouedraogo used a fake foreign passport." (Dkt. 321 at 2.) The Order for Detention did not mention the codefendants' flight. (*Id.*) Given these facts, the Court cannot conclude that the delay in Ouedraogo's arrest caused his pretrial detention.

Because the delay in Ouedraogo's arrest did not cause him any particularized prejudice, and because the Government acted with reasonable diligence, Ouedraogo is not entitled to relief under the Sixth Amendment. *See Erenas-Luna*, 560 F.3d at 778-79 ("A showing of actual prejudice is required if the government exercised reasonable diligence in pursuing the defendant."). However, for completeness, the Court also addresses the question of whether, if the delay had been caused by the government's negligence, the length of the delay at issue would be long enough for the prejudice factor to weigh in favor of the defendant despite the lack of particularized prejudice. *See Doggett*, 505 U.S. at 657 ("to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice."); *Erenas-Luna*, 560 F.3d at 779-80.

18

### 3.    Presumptive Prejudice

When the reason for delay is Government negligence, prejudice can be presumed if the length of the delay is excessive. *Erenas-Luna*, 560 F.3d at 779. The Supreme Court concluded that a pre-arrest delay of eight- and one-half years met this threshold, and the Eighth Circuit has recognized that a delay of three years also meets this threshold. *See Doggett*, 505 U.S. at 657-58; *Erenas-Luna*, 560 F.3d at 780. In *United States v. Cooley*, however, the Eighth Circuit concluded that a pre-arrest delay of 29 months, only 8 of which were attributable to government negligence, "was not of such length to eliminate the need to show particularized prejudice." 63 F.4th 1173, 1180 (8th Cir. 2023). Ouedraogo has not cited to any case, in this Circuit or otherwise, where a court concluded that a delay of 20 months or shorter was long enough to warrant relief absent a showing of particularized prejudice. Therefore, the Court concludes that even if the Government had been negligent in pursuing Ouedraogo's arrest, a 20-month delay is not long enough to warrant relief without a showing of particularized prejudice.

## III.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:** Defendant Jean Loic Ouedraogo's Motion to Dismiss the Indictment for Violation of Defendant's Sixth Amendment Right to a Speedy Trial (Dkt. 331) be **DENIED**.

Dated: November 10, 2025

*s/Elizabeth Cowan Wright*
ELIZABETH COWAN WRIGHT
United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).